406 F.2d 1112
Jane LEVIN, on behalf of herself and all others similarly situated, Appellants andMatilda Burger et al. (Intervenor-Plaintiffs), andSamuel A. Mehlman, on behalf of himself and all others similarly situated (Preferred Stockholders-Intervenor-Plaintiff),v.The GREAT WESTERN SUGAR COMPANY et al.
No. 17080.
United States Court of Appeals Third Circuit.
Argued November 22, 1968.
Decided February 5, 1969.
As Amended February 20, 1969.

Milton Handler, Kaye, Scholer, Fierman, Hays & Handler, New York City (Golden, Wienshienk & Mandel, Sonnenschein & Sherman, Ralph Wienshienk, Irving Sonnenschein, Bernard Rothman, New York City, on the brief), for appellants.
Simon H. Rifkind, Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City (Stryker, Tams & Dill, Newark, N. J., Pitney, Hardin & Kipp, Newark, N. J., on the brief), for appellees.
OPINION OF THE COURT
Before GANEY, FREEDMAN and SEITZ, Circuit Judges.
SEITZ, Circuit Judge.

1
Plaintiff, Jane Levin, the holder of 1100 shares of the common stock of the Great Western Sugar Company (Sugar), commenced this action in the district court to enjoin the merger of Sugar and the Colorado Milling and Elevator Company (Milling) into a subsidiary of Milling, the Great Western United Corporation (United). Sugar, Milling, and United and the directors of Sugar and Milling were named as defendants1 (defendants). Additional holders of 4100 shares of Sugar's common stock and one holder of preferred stock of Sugar, who filed his own complaint, intervened. After final hearing the district court rendered judgment for the defendants. This appeal is taken by plaintiff on behalf of herself and the other Sugar common stockholders only.

2
Plaintiff's complaint stated three claims. The first arose under § 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and its implementing Rule 10b-5 (17 C.F.R. 240.10b-5) and provided the primary basis for federal jurisdiction. It alleged that the proposed merger by itself and in connection with certain activities on the part of defendants amounting to a scheme or conspiracy constituted an unlawful device, scheme, and artifice to defraud and were acts, practices, and courses of business which operated as a fraud and deceit upon plaintiff. The second claim alleged a New Jersey state law cause of action and rested on the pendent jurisdiction of the district court. It asserted common law fraud2 and the unfairness of the terms of the merger as grounds for relief. The third claim again alleged the state law claim that the terms of the merger were unfair, but jurisdiction was based solely on diversity of citizenship and it was brought only against the corporate defendants (Sugar, Milling and United).

3
The heart of plaintiff's complaint is that the terms of the merger were unfair to the common stockholders of Sugar, giving rise to equitable relief under state law and resulting in a fraud upon the Sugar common stockholders in violation of federal law. With this in mind, we turn to the pertinent background information. We note, preliminarily, that the dispute is not as to the basic facts found in the district court opinion but as to the inferences to be drawn therefrom.

4
Sugar was engaged in the production of sugar and its by-products from sugar beets and was the largest sugar beet producer in the country, accounting for about 25% of the beet sugar marketed in this country and having a net worth of approximately $93,000,000 as of February 28, 1967. Milling was principally engaged in the manufacture and sale of wheat, flour, and mixes, and animal feeds. It also bought and sold grains, beans, seeds and fertilizers, and stored grains for the public in company-owned elevators. Milling's net worth was approximately $24,000,000 as of May 31, 1967.

5
The Sugar-Milling merger was the brainchild of William White, Jr. In December of 1964, White became a director of Milling at the unanimous request of the directors of that company. In September of 1965, he became chairman of the Milling executive committee and, in April of 1966, chairman of the Board of Directors. In August of 1965, he began to purchase substantial quantities of Milling stock so that, by April of 1967, he held approximately 18% of that company's outstanding stock. The purchases were financed to a large extent by bank loans, which were secured in part by a pledge of the stock.

6
White first conceived of Milling making a public tender offer for Sugar stock in February of 1966, and, in April of that year, when the Sugar directors decided not to oppose it, Milling made the tender offer. It was financed by a loan, which was conditional on the successful completion of a merger between Sugar and Milling. The tender offer was aimed primarily at Sugar's preferred stock, since, by virtue of its unusual voting structure, each of the 150,000 preferred shares had one vote, while each of the 1,800,000 shares of common had only 1/12 of a vote, thereby giving the aggregate preferred holders 50% of the voting power.

7
As a result of the purchases of the Sugar stock tendered it, Milling obtained virtual voting control of Sugar in electing directors. Concommitant with its new voting control, six of the eleven directorships were filled by Milling. A seventh director was William White's father, who had served on its board previously. He and the other four remained from the old administration.

8
White thereafter arranged for Milling to employ Standard Research Consultants, Inc. (SRC) to recommend one or more plans for a merger of Sugar and Milling. After two early draft plans involving the exchange of only common stock had been discarded, SRC finally came up with a plan which Milling was prepared to submit to Sugar and its financial advisers, Dillon, Read & Co. (Dillon Read). The plan called for Milling stockholders to receive one share of common of United for each of their Milling shares, and for Sugar common stockholders to receive for each of their shares 3/10 of a share of common and one share of non-convertible preferred paying $1.75 per annum of the merged company.

9
Dillon Read studied the plan and concluded that, although "it was in the ball park" and with some improvements might be acceptable, the plan was not fair or equitable to Sugar's common stockholders as it was then drawn, because it did not provide them with sufficient equity participation, earnings growth, and other values. Negotiations followed among White, the Sugar directors, and representatives from SRC and Dillon Read without success. Dillon Read suggested making more common stock available to Sugar common stockholders and using a convertible preferred. White proposed giving Sugar common stockholders an alternative of either all common or all preferred of United. Nothing came of these suggestions.

10
SRC then revised its suggested plan of merger as to Sugar common stockholders giving them 1/3 instead of 3/10 of a share of United common for each of their shares and $1.80 per annum instead of $1.75 on the preferred, thereby increasing the Sugar common stockholders' equity participation in United by 10% and the dividend on their preferred by five cents. Apparently dissatisfied with the inability of Dillon Read to come to an agreement on the merger terms and in order to get a fresh look, Sugar suspended Dillon Read as its financial advisers and hired Kidder, Peabody & Company (Kidder Peabody) to appraise the revised plan of merger.

11
Kidder Peabody approved the plan with some modifications, one of which was a further increase in the preferred dividend rate from $1.80 to $1.87 per annum. After hearing a presentation of the Kidder Peabody report, the directors of Sugar on January 20, 1967, adopted the Kidder Peabody modifications and unanimously approved the merger in principle. Shortly thereafter three of the four independent, non-Milling directors, who had voted for the merger, resigned. Their places were taken by members of the White group.

12
The plan was again submitted to Dillon Read to see whether it would now approve the plan as modified. After a brief review, Dillon Read gave an oral opinion that it could not withdraw its objections or express an opinion as to the fairness of the plan without a new analysis, taking into account various developments which had taken place since its original study. Without authorizing Dillon Read to pursue the matter further, the Sugar board of directors approved the plan with the Kidder Peabody modifications and with a further increment in the United preferred dividend rate from $1.87 to $1.88 on April 12, 1967. The approval was made by a board consisting, except for one member, entirely of Milling designees. This civil action was commenced on June 27 of that year.

13
A stockholders meeting was called by Sugar for September 15, 1967, to vote on the merger. New Jersey law requires that the merger be approved by the votes of the holders of 2/3 of all the capital stock of each of the merging corporations. 14 N.J.Stat.Ann. 12-3. Thus, Milling's 47% voting control of Sugar, which consisted mainly of preferred stock, was reduced for the purpose of approving the merger to only 22%. The vote resulted in an overwhelming approval of the merger, with some 92% of the shares being voted in favor of the merger plan. Even without the Milling votes, the merger was approved by independent stockholders owning 59% of all the shares. The Milling stockholders also approved the merger.

14
The plan as finally approved provided that both Sugar and Milling would merge into United, the subsidiary of Milling. Each share of Milling stock would be exchanged for a share of a United common. Each share of Sugar common would be exchanged for 1/3 of a share of United common and one share of United $1.88 non-convertible cumulative preferred, with a stated value of $24 and redeemable after five years at various prices ranging from $28.80 downward to $24. A sinking fund would be set up in order to pay for the redeemable shares. Each share of Sugar preferred would be exchanged for one $190 face amount subordinated debenture of United, with 6% interest, maturing on May 1, 1987, and subject to redemption.3 The common and preferred shares of Sugar owned by Milling would be cancelled in consideration for United's assumption of the debts of Milling.

15
After the district court denied plaintiff relief below, she sought to restrain the merger pending the outcome of her appeal. The district court, as well as this court, denied the application for the restraining order, and, on January 15, 1968, the merger was consummated. It is not suggested that the merger may not be set aside if we find its terms to be unfair.

16
Before reaching the merits of plaintiff's objections to the merger, we must deal with defendant's jurisdictional objections. Defendants first contend that the district court did not have jurisdiction over the federal claim (for violation of Rule 10b-5 as implementing § 10(b) of the Securities Exchange Act of 1934), because plaintiff failed to state a claim thereunder. We think that the district court had jurisdiction over the subject matter of the 10b-5 claim. The contention of the failure to state a claim, however, is not a jurisdictional objection. Defendants' second contention is that there was an insufficient claim upon which to base the pendent jurisdiction of the district court over the state law claim in count two of the complaint. We believe that plaintiff asserted a sufficiently substantial claim under § 10(b) of the Securities Exchange Act and its implementing Rule 10b-5 to justify the district court's discretionary exercise of jurisdiction over the pendent state law claim.4

17
We now turn to plaintiff's contention that the terms of the merger were unfair to the Sugar common stockholders, keeping in mind that our duty is only to review the correctness of the material findings of the district court. The district court found that the burden of proof rested as a matter of New Jersey law on the defendants to show that the merger was fair. We think that under Brundage v. New Jersey Zinc, 48 N.J. 450, 226 A.2d 585, 226 A.2d 585 (1967), this ruling was correct.

18
Defendant's principal justification for the terms of the merger must be the "independent evaluation" of the SRC plan by Kidder Peabody. It was on the basis of the Kidder Peabody report that the directors of Sugar unanimously approved the terms of the merger. In the report, Kidder Peabody concluded that the Sugar common stockholder:

19
"1. Would find himself in a preferred equity position with respect to about 60% of market value of his new holdings;

20
"2. Would receive securities with an indicated market value of $47.80 per share of equivalent [Sugar] common stock, or a value that is 21% higher than the present market for the common, and a value that also compares favorably with the price range of the common over the past ten years, with the exception of 1963;

21
"3. Assuming that the dividend on [Milling] common is increased to $1.80, would receive a 20% increase in dividend income with 75% of such income in the form of a preferred and fixed payment;5

22
"4. Would obtain an increase of 1/3 of a vote per share until such time as the cumulative preferred stock would be redeemed. Initially, the [Sugar] common shareholders would have about 53% of the votes of the surviving corporation;

23
"5. Would also obtain an increase in book value from $24.95 to $34.70 per share;

24
"6. On the other hand, would receive about a 10-15% dilution in per share earnings; and

25
"7. Would be receiving `Section 306 Stock' and hence a favorable ruling from the IRS should be a condition for the exchange."

26
Plaintiff's principal objections are to numbers 2, 3, and 6 above: the findings of Kidder Peabody as to market value, dividend, and earnings per share. She does not take serious issue with the accuracy of the figures as representing the change in the position of Sugar's common stockholders as a result of the merger, but maintains that, when they are compared with the corresponding changes in the position of Milling's stockholders, the figures show a disproportionate benefit for Milling stockholders which makes the terms of the merger unfair to the Sugar common stockholders. We agree that plaintiff and the other Sugar common stockholders are entitled to a proportionate benefit in the merged corporation. We therefore turn to a close examination of plaintiff's claims as to disproportionality, mindful, nevertheless, that the burden of proof remains with defendants.

EARNINGS PER SHARE

27
Plaintiff maintains that whereas Sugar's common stockholders are suffering a 10-15% dilution in per share earnings (number 6 of the Kidder Peabody Report, quoted above) the Milling per share earnings more than double as a result of the merger. The disparity is even greater than indicated, plaintiff insists, because the figures do not reflect the differences in accounting procedures between the two companies.

28
A comparison of the earnings per share of the two companies since 1962 reveals the following: a steady increase in earnings for Milling over the past five years with the exception of 1967, but a slight decline in the earnings per share of Sugar common since a peak in 1964.6 The 1967 decline in Milling's earnings per share reflects the expenditures and loans incurred with respect to stock purchases pursuant to its tender offer for Sugar stock. The noticeable jump in the Milling earnings per share from 1965 to 1966 coincides with White's becoming a dominant influence in Milling and the resultant growth orientation of the corporation. It seems clear from the earnings' comparison chart that the prospects for growth in earnings for Milling in the future were excellent. Quite the opposite seemed true for Sugar, as the SRC Report pointed out:

29
"The entire sugar industry, of which [Sugar] is a part, is affected by Quota Controls imposed by the Secretary of Agriculture. Such controls affect the importation of sugar and the amount of cane and beet sugar that may be grown in the United States. The fact that Sugar is subject to limitations imposed under the Quota System naturally affects the growth capacity of the company."

30
In view of the past performances of both companies, it was therefore fair to accord greater weight to Milling's earnings potential than to Sugar's and to reflect this in the disparate allocation of post-merger earnings.

31
In any event, the effect to be accorded the earnings per share disparity may be discounted to some extent by the fact that, as a result of the merger, the Sugar common shareholders have received a prior claim on earnings to the extent of their preferred holdings in United. Furthermore, the pre-merger earnings gap between the two corporations apparently reflected in part at least a reticence on the part of Sugar management to make capital improvements and a contrasting program on the part of Milling of continuous plant modernization and improvement.

32
We therefore conclude that, when all the above factors are taken into account, the earnings factor is fairly reflected in the merger terms.

DIVIDENDS

33
Plaintiff next argues that the increase in the dividends accorded Milling stockholders over Sugar common stockholders through the merger was also disproportionate and as such an indicia of unfairness (Point 4 in the Kidder Peabody Report). The dividend increase for Milling stock is from $1.20 to an estimated $1.80, a 50% rise; the dividend increase for Sugar common stock is from $2.00 to an estimated $2.48, a 24% rise. Hence Milling stockholders are getting twice as great a percentage increase in their dividends as the Sugar common stockholders.

34
Defendants and the district court, in rejecting this argument, put great stress on the fact that of the estimated $2.48 dividend, $1.88 is "top dollar", i. e., preferred. This fact might not be so significant in a situation where considerable earnings earmarked for dividend payment are anticipated, for then both common and preferred will be assured of dividend payment and the fact that the preferred get paid first will not matter. But, where as here, by plaintiff's own admission, the policy of the board of directors of the new corporation is going to be to retain the earnings in the business for purposes of development and growth, the fact that plaintiff has $1.88 "top dollar" gives her and others of her class the advantage of guaranteed dividend payments which, in our view, fairly justifies the percentage differential.

35
Plaintiff counters, however, by saying that she is not getting "top dollar", but really "sixth" dollar on her United preferred, since her preferred dividend is subordinated in payment to the interest and amortization on the outstanding loan, the interest and amortization of the debentures, and the sinking fund for redemption of the preferred. But this argument does not take away from the fact that the United cumulative preferred are in a better position, with regard to the prospect of dividend payment, than the United common.

MARKET VALUE

36
Plaintiff's third argument as to disproportionality is directed to the finding as to market value in Point 2 of the Kidder Peabody Report. The pre-merger figures assigned to the market value of the Sugar common and Milling stock by Kidder Peabody are $39.50 for Sugar and $49 for Milling. The estimated post-merger values traced into their equivalents in United stock are $47.80 for Sugar common and $57 for Milling. This would have resulted in a proportionate increase fair to plaintiff, and plaintiff does not contend to the contrary. What plaintiff does urge is that the estimates were unrealistic in view of what actually did occur in the market after the merger was consummated.

37
The estimates proved accurate for the first week after the announcement of the merger. Thereafter the average actual market value up to the time of trial of the Sugar common and Milling as traced into their equivalents in United stock increased well above the predicted levels. While the Sugar common package in its equivalents fluctuated from a low of $50 (28% increase) to a high of $65 (66 2/3% increase), the Milling stock in United equivalents ranged from a low of $80 (70% increase) to a high of $116 (147% increase).

38
While reference to the post-merger market action is appropriate, it is equally in order to point out that hindsight is a slippery base upon which to stand in passing judgment, particularly in matters of valuation. We only pause to note that such later market action may be influenced by many factors having little or nothing to do with the fairness of a valuation judgment previously made. Indeed, market action may be a reflection of the business community's expectations arising from the appointment of a new corporate executive or from the ascendancy of a growth-oriented management. We think the estimates made by Kidder Peabody were properly arrived at on the basis of the then relevant information. Moreover, it was not only the Milling stock equvalent in United whose value rose above the predicted increase, but Sugar common stock's package as well, resulting in an even larger premium for plaintiff than projected.

39
Plaintiff directs the court's attention to one other alleged indicia of unfairness of the terms of the merger. That is cash flow. She claims that, as a result of the merger, the cash flow per share of Sugar common as traced into its United equivalent has declined by 16% while that of Milling in its United equivalent has increased 112%. We feel that the same factors which have led us to conclude that the earnings per share differential was fair are equally applicable to the cash flow differential, since the cash flow charts of both corporations closely follow those of earnings and reflect most of the same significant factors.

40
Plaintiff's final point as to the fairness of the merger is a more general one and is directed to the exchange of Sugar common stock in part for a so-called "rare-bird" security, United non-convertible preferred. The straight preferred limits the participation of the Sugar common stockholders in the growth of the merged corporation. Plaintiff even suggests that the exchange of Sugar common for United non-convertible preferred is prohibited under New Jersey law. Outwater v. Public Service Corp., 103 N.J.Eq. 461, 143 A. 729 (1928), aff'd, 104 N.J.Eq. 490, 146 A. 916 (1929).

41
Putting aside the question of illegality, we do not find anything inherently unfair in a common for non-convertible preferred exchange. Although the equity participation of Sugar common stockholders has been reduced by the transfer, the result is not a total freeze-out, since 1/3 of a share of common is also included in the package.

42
As to the issue of illegality, we do not think that Outwater, supra, stands for the proposition which plaintiff claims that it does. The vice chancellor in that case held that the provision in the agreement which required redemption of the non-convertible preferred within three years of the consummation of the merger effected a forced sale of the stockholder's equity and was therefore not permissible. The court was not concerned with the fact that the stock was non-convertible; it focused only on the redemption provision. Moreover, the factual setting in the case before us is readily distinguishable from that in Outwater in that here common as well as preferred stock have been given to the complaining stockholders. Hence, we can find no merit in plaintiff's claim that the exchange of Sugar common for non-convertible preferred was in violation of New Jersey law.

43
Our examination, therefore, of the merger plan as prepared by SRC, revised by Kidder Peabody, and adopted by both companies, and other factors which plaintiff would have us consider lead us to conclude that the district court was correct in deciding that the terms of the merger were fair as to plaintiff and the rest of the Sugar common stockholders. We recognize that it is most difficult to pass on the issue of fairness where the caliber of management and corporate growth potential form such a large basis for justification of the merger, but, in reaching our conclusion, we take note that Milling's tender offer for Sugar stock was not opposed by the then completely independent Sugar board of directors; that the Sugar directors, including four remaining from the independent board, one of whom owned 7300 shares of Sugar common stock worth approximately $250,000, unanimously approved the merger, and, finally, that the plan was approved by independent Sugar stockholders owning 59% of all its shares.

44
We have reviewed plaintiff's allegation that defendants breached their fiduciary obligation by the manner in which the merger was designed and imposed and her allegation of failure on the part of defendants to disclose material information in the Sugar proxy statement used to solicit votes for the merger and find them to be without merit. We thus hold that plaintiff is not entitled to relief on her state law claim and turn to her claim based on the alleged violation of Rule 10b-5.

45
It is not disputed that plaintiff has the burden of proof as to the federal claim. We have already rejected in connection with the state law claim her allegations that the merger plan was unfair and that defendants have failed to discharge their fiduciary obligations toward plaintiff. It is these same assertions which are the basis for her federal claim as well. It follows, a fortiori, that plaintiff has failed to meet her burden of proof as to her 10b-5 claim. In reaching this result, we have assumed without deciding that plaintiff has stated an otherwise valid claim.

46
The judgment of the district court in favor of all defendants is accordingly affirmed.

Notes:

1
While certain other defendants were named in the first two counts of plaintiff's complaint in the district court, they are not involved in this decision, and, accordingly, no further reference will be made to them

2
The common law fraud claim was rejected by the district court and has not been renewed on appeal

3
While a preferred stockholder attacked unsuccessfully the fairness of the plan as to his class in the district court, he did not appeal. The issue of fairness of the merger as to the Sugar preferred stockholders is, therefore, not before us

4
See United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), and Knuth v. Erie-Crawford Dairy Co-op. Ass'n., 395 F.2d 420, 426-427 (3rd Cir. 1968)

5
The estimated total dividend package after merger for the Sugar common stockholders was $2.48, $1.88 on the preferred and $.60 on the common. The pre-merger figure was $2.00. Hence the percentages in number 3

6

MILLING SUGAR
Earnings Pro Forma Pro Forma
per share Pre-merger After Pre-Merger After
Year Merger Merger

†1967 $2.94 6.03 4.42 3.89
*1966 3.52 - 4.57 -
*1965 2.42 - 4.63 -
*1964 2.18 - 4.96 -
*1963 1.70 - 3.30 -
*1962 1.66 - 4.03 -
† figures taken from the Sugar proxy statement.

*
figures taken from the Kidder Peabody Report